UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL ACTION NO. 07-10072-PBS |
| | ) |
| BUFORD GEORGE PETERSON, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S TRIAL BRIEF

The United States of America, by Carmen M. Ortiz, United States Attorney, and Assistant United States Attorneys B. Stephanie Siegmann and Jeffrey Auerhahn, hereby submits this trial brief addressing certain issues that may arise during the trial of this case.

**I.     INDICTMENT**

The defendant is charged in one count of a seven count indictment with making a false statement on a loan application in violation of 18 U.S.C. §1014. See Count 6. Count 6 of the Indictment charges that on or about January 21, 2002, Oussama Abdul Ziade ("Ziade") and Buford George Peterson ("Peterson") knowingly made a false statement for the purpose of influencing the action of the United States Small Business Administration ("SBA"), in connection with a loan application in the amount of $650,000 for Ptech, Inc. ("Ptech"), submitted under the SBA's Expanded Economic Injury Disaster Loan Program, a program created by the SBA to assist small businesses economically harmed by the terrorist attacks of September 11, 2001, in that Ziade and Peterson falsely represented the identities of the owners of Ptech stock by omitting in Ptech's stock ownership table contained in the SBA loan application, which the defendants signed, the fact that Sarmany Limited (a company that was at that time owned and controlled by Yassin Kadi, a Specially Designated Global Terrorist) owned 20% or more of the

1

stock of Ptech.

## II. SUMMARY OF THE GOVERNMENT'S CASE

### A. Ptech

Ptech, was a private, for-profit computer software company that was originally incorporated in Massachusetts on February 2, 1994.[1]  Ptech's principal place of business was last located at 500 Victory Road in Quincy, Massachusetts.  Ziade was the President, Chief Executive Officer, and Chairman of the Board of Directors of Ptech from its inception.  Peterson served as Ptech's Chief Financial Officer and Chief Operating Officer from in or about February 2001 to in or about August 2002.

Ziade and James Cerrato ("Cerrato") founded Ptech in 1994 with capital financing provided by a Saudi Arabian investor, Yassin Kadi a/k/a "Shaykh Yassin Abdullah Kadi," "Yassin A. A. Kadi," "Yassin Al-Kadi," "Yasin Kahdi," "Yasin Al-Qadi," and "Yassin Qadi" ("Kadi").  Initially, in 1994, Kadi invested approximately $5 million in Ptech through Sarmany Limited, an Isle of Man company Kadi owned and controlled.  In exchange for this investment, Ptech issued stock certificate number 3 to Sarmany representing 47,700 shares of Ptech common stock.

Subsequently, between 1995 and 2001, Kadi invested an additional 5 million dollars into Ptech through other foreign companies he owned and controlled including Caravan Company Limited (Malaysia), Caravan Development Group Limited (Isle of Man), Perdana Investment Limited (Malaysia), and Sara Company (Malaysia).  By October 2001, Kadi owned or controlled

---

[1] Ptech is no longer in operation; Ziade is believed to be operating a successor company abroad after fleeing the United States in approximately April 2005.

approximately 50% of Ptech common stock. Kadi made his largest investment and held the largest amount of Ptech shares, however, through Sarmany.

According to records obtained from the Isle of Man, Kadi was a director of Sarmany until April 2002 and owned fifty percent of its shares until 1999 when he transferred his shares to Ilana Limited, a company owned by Kadi's son and wife. By 2001, according to Ptech's own internal capitalization[2] tables (copies of which Peterson received, maintained, and later amended) Sarmany Limited held 55,800 shares of Ptech common stock, which represented between 33.82-35.3% of Ptech's outstanding issued shares. As late as May 2002, capitalization tables in the possession of Peterson, indicated that Sarmany was issued two stock certificates (numbers 3 and 41) in exchange for an investment of approximately five million dollars. The original stock certificates issued to Sarmany were seized from Ptech offices during a search in December 2002.[3]

B. <u>Ptech's Majority Shareholder Designated a Terrorist.</u>

On September 23, 2001, under the authority of International Emergency Economic

---

[2]A capitalization table is a chart or table that summarizes the specific composition of a company's capital structure. In other words, it shows the total amount of the various securities (i.e, shares, warrants, etc.) issued by a firm or company. In general, a capitalization table tracks the ownership interest in a company (most commonly, number of shares issued and the value of those shares). Ptech's capitalization or "cap" tables chronologically identified each investment made and the shares issued with respect to each investment. These tables listed each shareholder by share certificate number, the amount of shares issued to each shareholder, the date the shares were issued to each shareholder, the type of shares issued, and the value of those shares. The table also identified whether the shares were obtained from an original investment or from a stock transfer.

[3]According to the endorsement on the back of these share certificates, on April 24, 2002, three months after Ziade and Peterson made false statements to the SBA about Ptech's owners, Sarmany's shares were transferred to other foreign companies at Ziade's suggestion.

Powers Act,[4] then President Bush issued Executive Order 13224, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism." In this Executive Order, the President declared a national emergency to address "the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001" and "the continuing and immediate threat of further attacks on United States nationals or the United States. . ." The President further found that it was necessary "because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists" to impose financial sanctions against "foreign persons that support or otherwise associate with these foreign terrorists."

Executive Order 13224, among other things, prohibits any transaction or dealing by United States persons in property or any interest in property of organizations or individuals named in the Annex to the Order or declared to be a Specially Designated Global Terrorist by the U.S. Secretary of State or the Secretary of Treasury pursuant to the criteria articulated in the Order. The Executive Order also blocks, or freezes, any interest in property held by any organization or person determined to be subject to the Order. Executive Order 13224 further specifically prohibits: (1) any transaction "that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order . . .; and (2) any conspiracy formed to violate any of the prohibitions set forth in this order . . ."

---

[4] Under the International Emergency Economic Powers Act (Title 50, Unites States Code, Sections 1701-1705), the President of the United States has the authority "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701. The President deals with unusual or extraordinary threats through Executive Orders, which have the force and effect of law. A violation of an Executive Order is an illegal act punishable under 50 U.S.C. § 1705.

4

Attached to Executive Order 13224, the President identified 12 individuals and 15 organizations whose property and interests in property were blocked pursuant to the Order.  See Annex to Executive Order 13224.  On October 12, 2001, pursuant to Executive Order 13224, the United States government designated Yassin Kadi as a Specially Designated Global Terrorist ("SDGT"), thereby blocking all property in which Kadi held any interest.

On October 26, 2001, the Office of Foreign Assets Control, a component of the U.S. Department of Treasury, published the amended list of blocked persons pursuant to Executive Order 13224.  See 66 Federal Register 54404.  Kadi was designated as follows:

> AL-QADI, Yasin (a.k.a. KADI, Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin) Jeddah, Saudi Arabia (individual) [SDGT].
>
> KADI, Shaykh Yassin Abdullah (see Al-Qadi, Yasin) (individual) [SDGT].
>
> KAHDI, Yasin (see AL-QADI, Yasin) (individual) [SDGT].

66 Federal Register at 54406, 55408.  This designation made it illegal (*i.e.*, a federal felony) for any United States person or entity to conduct any transaction or deal in property, or an interest in property, of Kadi in the United States.

Accordingly, when Kadi was designated as a SDGT in October 2001, Ptech was required to freeze all assets, shares or property interests of Kadi or any company with which he held any interest, including a beneficial interest, and was prohibited from conducting, attempting to conduct, or conspiring to engage in, any transactions involving Kadi's or his company's Ptech stock.  Ptech failed to block the assets of Yassin Kadi and engaged, or, at a minimum, attempted to engage or conspired to engage, in transactions involving those assets in violation of the provisions of Executive Order 13224 and Section 1705 of Title 50 of the United States Code.  To the contrary, Ziade, Ptech's Chief Executive Officer and President, and others engaged in a

scheme to conceal Kadi's ownership interests in Ptech by transferring millions of dollars worth of Kadi's Ptech holdings to other companies. These transfers occurred after Kadi was designated as a SDGT.

    C.    <u>Peterson and Ziade Committed SBA Loan Fraud</u>

In January 2002, Ptech submitted a loan application to the SBA for $650,000 under the Expanded Economic Injury Disaster Loan Program, a program created to help small businesses economically harmed by "the destruction of the World Trade Center or damage to the Pentagon on September 11, 2001." The SBA instructed Ptech orally and in writing, that it was required, in its application, to provide the names of any individual or entity that owned 20% or more of Ptech <u>See</u> Ex. 10b (SBA loan application: Filing Requirements ¶3 and application at ¶20). Notwithstanding this instruction, with its loan application, Peterson provided the SBA a false "Ptech, Inc. Ownership table," which concealed the fact that Sarmany, a Kadi controlled company, owned 20% or more of Ptech stock at the time of its application for the 9/11 disaster loan. <u>See</u> Ex. 10b (Peterson's coverletter to SBA: "Please find enclosed the following: . . . A listing of all shareholders (owners) and their respective ownership percentage. . .").

SBA's loan application for the 9/11 disaster loan required every applicant to identify by name each "stockholder owning 20% or more voting stock" and file "for each owner having a 20% or more interest, . . . a current . . . personal financial statement . . ., a complete copy, including all schedules, of the most recent Federal Tax Return, and a complete and signed IRS Form 8821 [tax information authorization]." Further, it was SBA's practice to research the majority shareholders of every corporate applicant (i.e., obtain corporate records and tax filings) and require all majority shareholders to execute a guarantee for any loan disbursed. The SBA

6

loan application signed by Peterson and Ziade only identified one majority shareholder, Object Investors, which was owned by Ziade, and concealed the fact that Sarmany (a company that was at that time owned and/or controlled by Yassin Kadi, a Specially Designated Global Terrorist) owned approximately 34% of Ptech's stock. See Count 6 of Indictment. By concealing Ptech's majority foreign investor from the SBA, Peterson and Ziade denied the SBA the ability to conduct any due diligence on Sarmany. In so doing, they further prevented the SBA and the U.S. government from learning about the connection between Ptech and a Specially Designated Global Terrorist.

Like Ziade, Peterson knew that the stock ownership table, which was submitted to the SBA, was false. Both Peterson and Ziade signed the application certifying that "all information" contained in the application was "true and complete to the best of [their] knowledge." In January 2002, when the SBA loan application was submitted, Peterson was serving as Ptech's Chief Financial Officer. In this role, Peterson maintained and had access to Ptech's stock ownership and financial records. Beginning in April 2001, Peterson learned the identities of Ptech's shareholders and its majority shareholder, Sarmany Limited. According to computer records obtained from a consensual search of Ziade's laptop computer, within one month of joining Ptech, in April 2001, Ziade e-mailed Peterson Ptech's board minutes from 1998-2000 and Ptech's current capitalization table.[5] This capitalization table identified Sarmany Limited as a majority shareholder holding 55,800 shares of Ptech.

Peterson himself emailed stock ownership tables (internally referred to at Ptech as

---

[5] A copy of this email printed out by Peterson was also found during the search of Ptech in a folder marked "Board Minutes". This folder also contained copies of board minutes dating back to 1998, which clearly identified Kadi as one of Ptech's directors.

7

capitalization tables) identifying Sarmany as a majority shareholder of Ptech on numerous occasions between May 2001 and January 2002. Indeed, on May 9, 2001, Peterson e-mailed Ziade, two Ptech board members, and Kadi a "summary cap table," which identified Sarmany as a owner of 34% of Ptech's issued common stock.

Peterson own statements suggest that it was his idea to submit a misleading and false ownership table[6] to the SBA with Ptech's application. On January 13, 2002, Peterson advised Ptech management and directors via e-mail that the SBA loan application would be submitted "once we complete the consolidation of many of our individual investors into larger investor groups in order to simplify our cap table..." Two days later, on January 15, 2002, Ziade e-mailed Peterson and the Ptech controller a ownership table for the SBA loan application and stated "[t]his is what I come up with as Cap Table." In comparison to Ptech's actual stock capitalization tables maintained by Ziade and Peterson, among other things, this ownership table created for the SBA: (1) omitted Sarmany's name from the list of owners although it was Ptech's largest shareholder;[7] (3) identified by name 6 alleged[8] shareholders (including Ziade)[9] none of whom except Ziade owned more than 20% of Ptech's shares; and (4) falsified the percentage of

---

[6] As indicated above, the SBA did not require a list of all owners; rather it instructed all applicants to provide a list of all owners of more than 20% of the applicant company's stock. Thus, when Ziade and Peterson decided to submit an ownership table instead of identify the majority owners, it was required to be accurate and at a minimum correctly identify the majority shareholders, which they did not.

[7] Sarmany held those shares until on or about April 24, 2002 according to records seized from Ptech.

[8] The SBA Capitalization table even identified one non-shareholder as a owner of Ptech stock.

[9] Ptech's actual capitalization tables included more than 40 shareholders (individuals and entities), the majority of which were foreign.

8

ownership of each shareholder identified. Even though this capitalization table created by Ziade was clearly false, Peterson included it in the package he sent to the SBA with the loan application and falsely represented to the SBA that it was true and complete.

### III. LEGAL ISSUES

A. Admissibility of Ptech Records Seized during Search of Ptech, Found during Consensual Search of Ziade's Laptop, and Produced Pursuant to Subpoenas.

The government will seek to introduce at trial Ptech records including correspondence, share certificates, spreadsheets, board meeting minutes, and other stock ownership documents, which were either seized from Ptech on December 5, 2002, obtained from a consensual search of Ziade's laptop computer, or produced pursuant to subpoenas. These records are admissible as exceptions to hearsay as business records under Fed. R. Evid. 803(b) and as documents affecting an interest in property under Fed. R. Evid. 803(15). In addition, many of these records were reviewed by or sent to Peterson via electronic mail and are therefore also admissible to establish the defendant's knowledge of Ptech's stock ownership (particularly, Sarmany's status as a majority shareholder and Kadi's involvement in Ptech business affairs). Lastly, to the extent that these records include statements of Peterson, they are admissible under Fed. R. Evid. 801(d)(2)(A).

Under Rule 803(6), a "memorandum, report, record, or data compilation, in any form" is admissible so long as that data was kept in the course of a "business" activity and it was the regular practice of that business to make such a record. Fed. R. Evid. 803(6); see 4 Stephen A. Saltzburg, et al., Federal Rules of Evidence 803-41 (9th Ed. 2006) (based upon legislative history, business records are given an expansive interpretation to include records covering any regularly conducted activity).

Ptech's share certificates, stockholder agreements, investor correspondence, minutes of meetings of the board of directors, minutes of shareholder meetings, financial records (including stock ownership tables and spreadsheets summarizing investments) are admissible as business records under 803(6). See United States v. Munoz-Franco, 487 F.3d 25, 38-40 (1st Cir. 2007) (board minutes were admissible as business records under 803(6) and correspondingly, the absence of information in the minutes was admissible under 803(7)); United States v. Moore, 923 F.2d 910, 914 (1st Cir. 1991) (fourteen computer generated loan histories containing a summary of each loan admissible as business record); United States v. Tyrrell, 2008 WL 698929, *4 (11th Cir. Mar. 17, 2008) (investor correspondence and notes pertaining to several investors admissible as business records under 803(6)); see also United States v. Haag, 485 F.3d 1, 3 (1st Cir. 2007) (IRS computer-generated copies of correspondence sent admissible as business records under 803(6)); United States v. Lizotte, 856 F.2d 341, 344 (1st Cir. 1988) (drug dealer's calendar entries of drug sales admissible as business records under 803(6) in prosecution of dealer's attorney for conspiring to defraud the United States).

Ptech's share certificates, stockholder agreements, capitalization and stock ownership records, and correspondence, including electronic mail, regarding Kadi's stock ownership interest in Ptech are also admissible as statements in documents affecting an interest in property under Fed. R. Evid. 803(15). United States v. Weinstock, 863 F.Supp. 1529, 1535 (D. Utah 1994) ("a document does not have to be a dispositive document to be admissible under 803(15);" affidavit regarding ownership interest in stock and failure to deliver stock certificate admissible under Rule 803(15) because it could cause a new share certificate to be issued.); see, e.g., Avila v. Willits Environmental Remediation Trust, 2009 WL 1813125, *26 (N.D. Cal. Jun. 18, 2009)

(corporate acquisition and reorganization agreement admissible under Rule 803(15)); United States v. Miller, 2009 WL 3335928, *5 (E.D. Mich. Oct. 15, 2009) (handwritten notes regarding existence of second unrecorded deed admissible under Rule 803(15)); United States v. Abbey, 2007 WL 216294, *2 (E.D. Mich. Jan. 25, 2007) (private documents concerning the values of comparable properties generated and prepared for real estate closings admissible under Rule 803(15)); Embs v. Jordan Outdoor Enters. Ltd., 2005 WL 2250681,*3-4 (S.D. Ohio Sept. 15, 2005) (purchase and sale agreement admissible under Rule 803(15) to demonstrate assignment of patent ownership interests) ; Taylor v. United States, 1993 WL 597379, *2 (D. Ariz. Sept. 27, 1993) (settlement documents pertaining to transfer of real property, escrow instructions, and addendum to escrow instructions admissible under Rule 803(15)).  The share certificates would also be admissible under Rule 803(14) as records of documents affecting an interest in property.

B.    Foreign Records

The government will seek to introduce both foreign public records (company registers filed with applicable government authorities in the Isle of Man, Malaysia, and the States of Jersey, a United Kingdom territory, identifying the shareholders and directors of record of certain Kadi controlled companies who held shares in Ptech) and foreign business records. See Government Exs. 75-79.

On August 17, 2009, the government disclosed its intent to use records of Kadi's foreign ownership interest during its case-in-chief.  On August 26, 2009, foreign records obtained from the Isle of Man and Malaysia were produced.  On June 28, 2010, the government additionally advised the defendant of its intent to use foreign records obtained from Jersey regarding Illana

11

Limited. On July 8, 2010, the government provided formal notice[10] of its intent to introduce certified foreign records and provided copies of the excerpts of the original files it intended to introduce at trial. The government further advised that the original certifications and foreign files were available for inspection. The certified foreign records produced to the defendant and identified on the government's exhibit list are admissible under 18 U.S.C. §3505 and Fed. R. Evid. 902(12) (foreign business records) or Fed. R. Evid. 902(3) (foreign public records).

Pursuant to 18 U.S.C. §3505, copies of foreign records "of regularly conducted activity" are admissible "if a foreign certification attests that -

> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of such matters;
> (B) such record was kept in the course of a regularly conducted business activity;
> (C) the business activity made such a record as a regular practice; and
> (D) if such record is not the original, such a record is a duplicate of the original; unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.
> (2) A foreign certification under this section shall authenticate such record or duplicate.

The Isle of Man and Jersey certifications establish that the records were indeed kept and made in the regular course of business in a foreign country and made at or near the time of the matters set forth therein by a person with knowledge. They further contain the attestations required under Section 3505 and there is no information to indicate a lack of trustworthiness.

Similarly, foreign public records are admissible under Fed. R. Evid. 902(3) as long as they contain a certification from an official of the foreign government or certain U.S.

---

[10]On or about June 16, 2010, government counsel advised defense that it would seek to introduce foreign records regarding Kadi controlled companies during a telephone conversation regarding potential stipulations and exhibits.

representatives at the foreign country's embassy or a diplomatic or consular agent of the United States. Each of the Malaysian records (annual returns of Kadi controlled companies) contain a certification that the record was filed with the Labuan Offshore Financial Services Authority, a governmental entity and bears the signature of a foreign government official.

The original certifications obtained by the government to authenticate the foreign public records and foreign business records satisfy the criteria set forth in Rules 902(3) and 902(12) and 18 U.S.C. §3505. These foreign records, Exhibits 75-79, should therefore be admitted at trial.

C.   Use of Terms SDGT and 9/11

The government will seek to introduce Executive Order 13224 and the designation of Kadi as a Specially Designated Global Terrorist, which was published in the Federal Register in October 2001, two and half months prior to Peterson filing the fraudulent SBA loan application.[11] The government will further seek to establish the type of loan for which the defendants were applying and supplied false information. On behalf of Ptech, Ziade and Peterson applied for a SBA loan designed to compensate businesses that were adversely affected by the September 11, 2001 attacks. Consequently, a portion of the loan application required the defendants to summarize business losses suffered as a result of the events of September 11th. The designation of one of Ptech's investors and the type of loan at issue (and the information requested and provided to SBA) is part and parcel of the offense. This information is admissible as it is inextricably intertwined with the charged offense without regard to Rule 404(b) of the Federal Rules of Evidence. See United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005) (tax

---

[11] See United States v. Houle, 237 F.3d 71, 77-78 (1st Cir. 2001)(evidence must be considered in light of proximity in time to charged acts and to resemblance to crimes charged).

13

return inextricably intertwined with crime as return reported income received from fraudulent scheme); United States v. Fazal-Ur-Rahmean-Fazal, 355 F.3d 40, 50 (1st Cir. 2004) (in international parental kidnapping case, threats made by father against mother properly admitted as intrinsic evidence where it was introduced as part of events leading up to charged crimes and directly related to intent element of kidnaping offense); United States v. Santagata, 924 F.2d 391, 394 (1st Cir. 1991)(documents reflecting telephone orders were relevant to the existence of charged wire fraud scheme and independently admissible without application of Rule 404(b)). Without this information, the jury will have no context in which to evaluate the events alleged to have occurred.

Alternatively, the evidence regarding Kadi's designation is admissible under Federal Rule of Evidence 404(b) to prove the defendant's unlawful intent, preparation, plan, motive, and knowledge. Rule 404(b) allows "[e]vidence of other crimes, wrongs, or acts" to be introduced for a non-propensity purpose such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This rule is permissive in nature and its sole purpose "is to provide an exception to the common law rule barring evidence of prior bad acts." United States v. DeCicco, 370 F.3d 206, 214 (1st Cir. 2004).

The First Circuit Court of Appeals has adopted a two-part test to determine admissibility of evidence offered under Rule 404(b). United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995). First, the proffered evidence must have some "special relevance" or "special" probative value independent of its tendency to show the defendant's bad character or criminal propensity. United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). Second, the probative value of the proffered evidence is not substantially outweighed by the danger of unfair

prejudice.  Frankhauser, 80 F.3d at 648.

Rule 404(b) evidence has special relevance if it "would allow a juror to make at least one inference probative" of a material issue.  United States v. Nickens, 955 F.2d 112, 124-125 (1st Cir. 1993) (citations omitted); see United States v. Jimenez, 507 F.3d 13, 17 (1st Cir. 2007) ("showing of special relevance is not particularly demanding.").  Here, the fact that a majority investor (or at a minimum, a director of a majority shareholder) who was involved in Ptech's business affairs was designated as a terrorist less than three months prior to the time Ptech submitted a falsified list of shareholders has "special relevance" in establishing the defendant's unlawful intent to deceive and influence the SBA.

The First Circuit "has held that when evidence goes to show motive, the relevancy hurdle is particularly low."  United States v. McMahon, 938 F.2d 1501, 1508 (1st Cir. 1991).  The First Circuit has approved of the government's introduction of motive evidence in fraud and false statement cases.  See, e.g., United States v. Sebbagala, 256 F.3d 59, 67-68 (1st Cir. 2001)(upholding introduction of "mass of [stolen and altered] travelers' checks" on ground that such evidence was "probative of motive on false statement counts; their existence furnished a cogent reason for the appellant to lie to the customs inspectors about the value of the monetary instruments in his possession"); McMahon, 938 F.2d at 1507-08 (upholding admission of evidence of defendant's financial difficulties in extortion case because it "clearly tended to make it more likely that he would have sought money from an illegal venture."); United States v. Guyon, 27 F.3d 723, 729 (1st Cir. 1994) (uncharged loan applications had "'special' relevance" in that they were probative on issue of whether the defendant intended to defraud various banks when he applied for charged loans).  For instance, in DeCicco, the First Circuit held that it was

15

error to exclude testimony about the defendant's financial condition. 370 F.3d at 213-14. In that case, the defendant was charged with transmitting false and fraudulent insurance claims for building loss proceeds and setting fire to his warehouse. The government sought to admit testimony from the defendant's accountant regarding DeCicco's tax liabilities at the time of fire. Id. at 213. The Court concluded that this testimony was "especially relevant . . . because it tends to establish the motive for the alleged mail fraud and arson." Id. at 214.

**No Unfair Prejudice**

The probative value of the proffered evidence is not substantially outweighed by the danger of unfair prejudice. The proffered evidence is highly probative. "The fact that a piece of evidence hurts a party's chances does not mean it should automatically be excluded, [or] there would be precious little left in the way of probative evidence in any case." Carty, 993 F.2d at 1011 (1st Cir. 1993) (quoting Onujiogu v. United States, 817 F.2d 3, 6 (1st Cir. 1987)). Fed. R. Evid. 403 shields a defendant only "'against unfair prejudice, not against all prejudice.'" See United States v. Pinillos-Priesto, 419 F.3d 61, 72 (1st Cir. 2005) ("'Virtually all evidence is prejudicial ... but it is only unfair prejudice against which the law protects.'") (citation omitted).

Finally, the Court can minimize any potential danger of unfair prejudice caused by the admission of this evidence by issuing a limiting jury instruction regarding the proper relevance of the evidence. The First Circuit has approved the use of such limiting instructions as an appropriate means of protecting a defendant against the possibility that a jury might draw improper conclusions from a defendant's prior bad acts. See, e.g., United States v. Freeman, 208 F.3d 332, 345 (1st Cir. 2000) ("'the potential for prejudice . . . can be satisfactorily dispelled by appropriate curative instructions.'") (citation omitted).

## V. **Length of Trial**

The government anticipates that the trial will last 10 days.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ B. Stephanie Siegmann
B. STEPHANIE SIEGMANN
JEFFREY AUERHAHN
Assistant U.S. Attorneys

Dated: July 15, 2010

## Certificate of Service

I do hereby certify that a copy of the foregoing government's trial brief was served upon counsel of record for the defendant by electronic notice on this 15th day of July 2010.

/s/ B. Stephanie Siegmann
B. Stephanie Siegmann
Assistant U.S. Attorney